UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JULIE KARJALA                                    Civil No. 05-718 (RHK/FLN)

                    Plaintiff,

v.

JO ANNE B. BARNHART,                    **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

                    Defendant.
_____

Ethel Schaen and Thomas Krause, for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.
_____

Plaintiff Julie Karjala seeks judicial review of the final decision of the Commissioner of Social

Security ("Commissioner"), who denied her applications for periods of disability, disability insurance

benefits ("DIB") and Supplemental Security Income ("SSI") payments.  See 42 U.S.C. § 1382 (c).  This

Court has appellate jurisdiction over the claim pursuant to 42 U.S.C. §§ 405 (g).  The matter was referred

to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C.

§ 636 and Local Rule 72.1(c).  The parties have submitted cross-motions for summary judgment [# 17 and

#31].  For the reasons set forth below, it is the Court's recommendation that the Commissioner's decision

be **REVERSED**.

## I.    INTRODUCTION

Plaintiff filed her applications for a period of disability, for DIB and SSI on November 27, 2001.

(Tr. at 96.)  Plaintiff initially alleged an onset date on her disability report as March 23, 1993; however, this

date was recorded in error and later amended to reflect a disability onset date of December 31, 1998, due

to degenerative cervical disc disease status post an anterior cervical discectomy and fusion. (Tr. at 48; 96.)

The claim was initially denied on February 13, 2002, and on reconsideration on July 25, 2002. (Tr. at 48.)

A request for a hearing was timely filed on September 11, 2002, and the hearing was held on May 13,

2003 in Minneapolis, Minnesota in front of Administrative Law Judge (ALJ) Michael D. Quayle. (Tr. at

48.) The ALJ issued an unfavorable decision on July 24, 2003. (Tr. at 45.) Plaintiff requested review and

the Appeals Council granted that request by vacating the ALJ's hearing decision and remanding the case

back to the ALJ for further proceedings on several issues that it identified in its order. (Tr. at 79; 82-86.)

The second administrative hearing was held on February 12, 2004, in Minneapolis, Minnesota in front of

ALJ Michael D. Quayle. (Tr. at 537.) On August 26, 2004, the ALJ issued an unfavorable decision. (Tr.

at 21.)

      The ALJ held that Plaintiff met the disability insurance status requirements of the Act from the date

of onset through December 31, 2005, and that she was insured for Title II disability benefits at all relevant

times. (Tr. at 25.) However, the ALJ concluded that Plaintiff was not disabled within the meaning of the

Social Security Act. (Tr. at 25.) Plaintiff filed a request for review which was denied on February 11,

2005. (Tr. at 15.) As a result of this denial, the ALJ's decision of August 26, 2004, stands as the final

decision of the Commissioner of Social Security. (Tr. at 15.)

      Plaintiff filed the instant appeal on April 8, 2005. [Docket Number 1.] Plaintiff and Defendant both

filed cross-motions for summary judgment. Plaintiff raises the following issues in her motion: (1) The ALJ

erred in his rejection of the opinion of the treating specialist, Dr. A. V. Anderson, regarding Plaintiff's need

to alternate positions and Plaintiff's inability to sustain work; and, (2) the ALJ failed to meet the burden of

proving that there is other work that Plaintiff can perform due to the numerous inconsistencies not resolved

by the ALJ.

## II.  STATEMENT OF FACTS

### A.  Background

Plaintiff was born on March 24, 1957 and was 46 years old at the time of the second administrative hearing on February 12, 2004.  (Tr. at 96; 537; 584.)  Plaintiff has a General Education Degree and attended one year of business college at Rathmussen business college, where she graduated with a word processing/secretarial certificate in 1985.  (Tr. at 584-85.)  Plaintiff alleges that she is disabled due to neck and back pain, the residuals of two cervical surgeries including a cervical fusion at C4-C7 and decompressive laminotomies at C5-C6 and C6-C7, headaches, depression and anxiety.  (Tr. 49; 133-142.)

### B.  Medical Evidence

On October 22, 1998, Plaintiff was seen by Dr. A.V.  Anderson and stated that she was experiencing pain "with episodes involving the neck, shoulder and jaw, predominately [on the] left side." (Tr. at 287.)  Plaintiff stated that she was awakened frequently due to pain and that she was still working eight hours per day at that time.  (Tr. at 287.)

On October 30, 1998, Plaintiff returned to Dr. Anderson and noted that she was still experiencing pain in her "neck, arm and left hand;" however, it was improved from her visit on October 22, 1998.  (Tr. at 285.)  Dr. Anderson noted that Plaintiff's use of the medication Percocet would be discontinued because she experienced significant gastric distress while taking this medication.  (Tr. at 285.)

On December 14, 1998, Plaintiff was seen by Dr. Timothy Garvey at the Twin Cities Spine Center. (Tr. at 235.)  Plaintiff complained of headaches, neck pain and "left parascapular pain." (Tr. at 235.)  At

3

that time Plaintiff noted that the symptoms she was experiencing were similar to the ones she experienced before her surgery in 1997.  (Tr. at 235.)  Dr. Garvey diagnosed Plaintiff with residual spinal stenosis and ordered selective nerve blocks at the C5-6 and C6-7 levels.  (Tr. at 235.)

On February 1, 1999, Plaintiff was again seen by Dr. Garvey, and Plaintiff decided to pursue her surgical options because the nerve blocks ordered by Dr. Garvey only provided temporary relief to her pain.  (Tr. at 234.)  On February 12, 1999, Plaintiff underwent a left C5-C6 and C6-C7 decompression with laminal foraminotomy for her neck and arm pain.  (Tr. at 227.)  The surgery initially provided Plaintiff with relief; however, by March 1999 the pain in her neck and left arm returned.  (Tr. at 284.)  Plaintiff was scheduled to be off of work until April 4, 1999, in order to allow her to recover from the surgery, and she was to work with restrictions until June 5, 1999.  (Tr. at 233.)  On April 9, 1999, Dr. Anderson wrote to Plaintiff's supervisor and stated that Plaintiff could not return to work at that time.  (Tr. at 283.)

On May 26, 1999, Plaintiff saw Dr. Anderson for a follow-up visit.  (Tr. at 279-80.)  Plaintiff reported that she was still experiencing pain in her neck and shoulder, that she experienced headaches and was having pain in both of her hips and buttocks, which occurred mostly at night and woke her up at night.  (Tr. at 279.)  Dr. Anderson noted that Plaintiff was taking a variety of medications and she was attempting to walk daily.  (Tr. at 279.)

On August 26, 1999, Plaintiff returned to Dr. Anderson and noted that she was continuing to have significant pain through her neck and in her shoulders.  (Tr. at 276.)  Plaintiff stated that she experienced pain through the thoracic spine again mostly on her left side but that she had been experiencing problems on both sides.  (Tr. at 276.)  Plaintiff also reiterated that she was having pain in both of her hips.  (Tr. at 276.)  Plaintiff noted that she still had not been able to return to work, and that she was even having

4

difficulty with her exercise due to the increase in pain through her neck and upper back.  (Tr. at 276.)  Dr. Anderson noted that he felt that Plaintiff still had "a significant amount of recovery to make before she [could] be returned to any type of gainful competitive employment."  (Tr. at 277.)  Dr. Anderson also noted that morphine increased Plaintiff's ability to function.  (Tr. at 276.)

On November 18, 1999, Plaintiff returned to see Dr. Anderson, and Plaintiff noted that she continued to experience pain through her neck and into the back of her head, along with mid back pain.  (Tr. at 273.)  By February 1, 2000, Plaintiff had still not returned to work.  (Tr. at 271.)  Plaintiff went to see Dr. Anderson on February 1, 2000, and noted that she continued to experience recurrent pain and problems with headaches and neck pain.  (Tr. at 271.)  Plaintiff also reported experiencing pain between her shoulder blades and down into her lower back.  (Tr. at 271.)  Plaintiff told Dr. Anderson that she believed that if she were not taking her medications she would have "a great deal of difficulty performing her activities of daily living."  (Tr. at 271.)

Dr. Anderson examined Plaintiff again on May 9, 2000, and determined that Plaintiff had some loss of range of motion in the cervical spine which was consistent with her surgical fusion.  (Tr. at 269.)  Dr. Anderson also noted that Plaintiff was trying to find a part time job at that time.  (Tr. at 269).  Dr. Anderson stated "I would like to have [Plaintiff] off her job search for at least the next four days.  She is having a flareup that has been significant in that regard."  (Tr. at 270.)

On July 17, 2000, Plaintiff returned to see Dr. Anderson.  (Tr. at 265-66.)  Plaintiff continued to experience neck pain, mid back pain and headaches.  (Tr. at 265.)  Plaintiff informed Dr. Anderson that she had recently begun working as a senior companion, sixteen hours per week.  (Tr. at 265.)  Plaintiff stated that she had been "tolerating this relatively well, though has experienced an increase in symptoms."

(Tr. at 265.)  Dr. Anderson increased Plaintiff's prescription for morphine, and advised Plaintiff to continue her daily stretching routine, as well as walking several times per week.  (Tr. at 266.)

On November 8, 2000, Plaintiff was seen by Dr. Anderson, and stated that she was still experiencing neck, back and left shoulder pain, but that "the past month has seen a substantial improvement in her symptoms . . . [Plaintiff] remark[ed] 'I haven't felt this good in years.'" (Tr. at 263.)  However, less than two months later, Plaintiff was back in Dr. Anderson's office on January 10, 2001, with symptoms of neck, back and right arm pain.  (Tr. at 261.)  Dr. Anderson encouraged Plaintiff to continue her exercise program.  (Tr. at 262.)

On April 11, 2001, Plaintiff was seen by Dr. Anderson and noted that she was experiencing an increase in the pain in her neck, head, back, arms and both hips.  (Tr. at 259.)  Plaintiff was also suffering from recurrent migraine headaches.  (Tr. at 259.)  Plaintiff continued to work four hours a day and was maintaining an exercise program two to three times a week.  (Tr. at 259.)  In spite of maintaining an exercise routine, Plaintiff complained that she had lost some strength in both arms, and Dr. Anderson's examination revealed that Plaintiff had loss of range of motion in the cervical spine that was consistent with his previous examinations.  (Tr. at 259.)

On August 27, 2001, Plaintiff was seen by Dr. Anderson and noted that she continued to have neck and back pain, but that her pain was controllable with medication.  (Tr. at 257.)  On October 1, 2001, Plaintiff was seen by Dr. Anderson, who noted that she was working up to four hours per day and had been able to tolerate this level of activity.  (Tr. at 255.)  Dr. Anderson noted that, at the time, Plaintiff was "having success with the medication protocol [which] allow[ed] her to work at least part-time, and she ha[d] been able to enjoy a greater quality of life with more personal activities."  (Tr. at 256.)  On

6

November 26, 2001, Dr. Anderson noted that Plaintiff had "been trying to work 2 to 3 hours per day four to five days per week [but that] [e]ven at this limited level she frequently has a sharp rise in pain at work." (Tr. at 252.) Dr. Anderson increased her dosage of MS Contin to 30 milligrams every night, with 15 milligrams every morning. (Tr. at 252.) Dr. Anderson also prescribed a tilt table for Plaintiff to use at home in order to "minimiz[e] the cervical flexion, which helps to decrease the frequency and intensity of [Plaintiff's] exacerbations." (Tr. at 253.)

On November 29, 2001, Plaintiff underwent a physical capabilities evaluation performed by Dr. Anderson. (Tr. at 254.) During this evaluation Dr. Anderson concluded that Plaintiff could sit, stand and walk for a total of fifteen minutes at a time, and a total of one hour during an eight-hour work day. (Tr. at 254.) Dr. Anderson further concluded that Plaintiff could only lift up to five pounds occasionally from the floor, could lift up to ten pounds occasionally from table height, and could carry up to ten pounds occasionally. (Tr. at 254.) Dr. Anderson noted that Plaintiff could use her hands for repetitive actions such as simple grasping for short periods of time, but that she could not use her hands for pushing and pulling of arm controls, she could not use her legs for pushing and pulling of leg controls, nor could she use hands for repetitive actions such as fine manipulations. (Tr. at 254.) Dr. Anderson further concluded that Plaintiff could occasionally bend and reach, but could not squat, crawl, climb or pull. (Tr. at 254.) Dr. Anderson noted that Plaintiff was restricted totally from exposure to changes in temperature and humidity, could operate an automobile for limited durations, was totally restricted from activities involving sustained positions, and could only complete a few repetitions for activities involving side to side bending and the rotations of her upper body. (Tr. at 254.)

On December 7, 2001, Dr. John Curran performed a psychiatric evaluation on Plaintiff, and

diagnosed her with adjustment reaction disorder.  (Tr. at 301-03.)  On December 10, 2001, Dr. Anderson

noted that Plaintiff was doing "much better" and that her "neck pain and head pain [was] rated at a 3/10"

during that visit.  (Tr. at 250.)  At that time Plaintiff was working three hours per day and was maintaining

her medication regimen.  (Tr. at 250.)  Plaintiff noted that, while she was feeling better, she continued to

experience muscle spasms and had limited range of motion.  (Tr. at 250.)

On January 30, 2002, Plaintiff was seen by Dr. Anderson with an increase in her incidence of pain

in her lower back and hips.  (Tr. at 335.)  Plaintiff also complained of continuing headaches and neck pain.

(Tr. at 335.)  Plaintiff described "the feelings and sensations of pain as being miserable and exhausting" and

noted that "the side of the neck and head is developing a squeezing sensation [and] [t]he low back and hip

pain is a deep and penetrating type of sensation."  (Tr. at 335.)  Plaintiff noted that she was working eight

hours per week, and was expecting her employer to increase her hours to fifteen hours per week.  (Tr. at

335.)  Plaintiff noted that she has difficulty sleeping, and is "awakened suddenly at night with an increase

in pain."  (Tr. at 335.)  Plaintiff reported an inability to complete household activities and an inability to walk

as far as she used to, as well as a difficulty maintaining "long-term sitting and standing positions."  (Tr. at

335.)  Dr. Anderson recommended increasing Plaintiff's dosage of MS Contin, and stated that he would

"have to order an MRI scan to determine whether or not there are, in fact, changes occurring of a

degenerative joint or disk nature."  (Tr. at 337.)

On February 5, 2002, Plaintiff was evaluated by Thomas Chisholm, M.D., who is a State Agency

Medical Consultant.  (Tr. at 304-311.)  Dr. Chisholm opined that Plaintiff could lift or carry ten pounds

occasionally and frequently, could stand or walk at least two hours in an eight hour work day and could

sit about six hours in an eight hour work day.  (Tr. at 304-306.)  Dr. Chisholm opined that Plaintiff was

limited to the sedentary exertion level with no repetitive overhead activities and that Plaintiff should avoid concentrated exposure to hazardous machinery and heights.  (Tr. at 304-311.)

On February 8, 2002, a mental residual functional capacity evaluation was completed by Dr. Dan Larson.  (Tr. at 404).  Dr. Larson concluded that Plaintiff "retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions."  (Tr. at 404.)  Dr. Larson noted that Plaintiff's "ability to carry out tasks with adequate persistence and pace would be . . . moderately impaired for detailed and markedly impaired for complex tasks."  (Tr. at 404.) Dr. Larson noted that Plaintiff's ability to get along and interact with co-workers and the public would be moderately impaired but adequate for "brief and superficial contact."  (Tr. at 404.)  Dr. Larson also noted that Plaintiff's ability to follow an ordinary routine, to accept supervision, and to handle stress would be moderately impaired, but sufficient to deal with the ordinary level of stress and supervision found in a customary work setting.  (Tr. at 404.)

Plaintiff was seen again by Dr. Anderson on February 18, 2002, and she complained of an increase in migraine and neck pain symptoms, as well as low back, right shoulder, left upper back and shoulder pain. (Tr. at 333.)  Dr. Anderson determined that Plaintiff should undergo an MRI scan of the cervical spine to investigate the increasing pain symptoms that she was experiencing.  (Tr. at 334.)  On March 11, 2002, Dr. Anderson concluded that Plaintiff "is permanently and totally disabled from pursuing any type of gainful, full-time employment.  Even the three hours per day, four days per week of very light duty activity is many times more than what she is able to tolerate."  (Tr. at 332.)  Dr. Anderson also noted that Plaintiff was "able to walk at least short distances for exercise" but that it was "quite difficult for her to lift anything more than

five to ten pounds." (Tr. at 332.)  Dr. Anderson also stated that he was "quite disappointed that there is some hesitancy on her third party payers part to pay for an MRI scan" and noted that this procedure was "certainly appropriate considering [his] expertise in this region and many years of experience to further ascertain information" regarding Plaintiff's condition.  (Tr. at 332.)

On March 28, 2002, Plaintiff participated in the orientation to the Biofeedback program with Dr. Lilli Ann Jeffrey-Smith.  (Tr. at 355.)  Dr. Anderson also referred Plaintiff to Dr. Ronald Berk, a licensed psychologist, for "evaluation and treatment of depression, anxiety and chronic pain."  (Tr. at 347.)  Plaintiff was evaluated by Dr. Berk on March 28, 2002, and Dr. Berk reviewed Plaintiff's accident history, treatment history and symptoms.  (Tr. at 347-49.)  Plaintiff reported experiencing depression as a result of her chronic pain and loss of function.  (Tr. at 347.)  Dr. Berk noted that at the end of the interview Plaintiff "suffered a severe panic attack."  (Tr. at 349.)  Dr. Berk's initial diagnostic impression was that Plaintiff suffered from adjustment disorder, depression, anxiety, and panic disorder without agoraphobia. (Tr. at 349.)  As a result of this evaluation, Dr. Berk continued to counsel Plaintiff regarding her depression. (Tr. at 394-99.)

On May 8, 2002, Dr. Jeffrey-Smith wrote to Dr. Berk informing him that Plaintiff had "made some short term gains" and noted that "with continued practice we should see the control of her symptomatology increase."  (Tr. at 354.)  On May 13, 2002, Plaintiff was examined by Dr. Mark Friedland for an independent medical examination related to her Worker's Compensation claim.  (Tr. at 441-48.)  Plaintiff testified that she spent approximately 20 to 25 minutes with Dr. Friedland during this examination, and that Dr. Friedland did not physically examine her.  (Tr. at 610.)  During the examination Dr. Friedland noted that Plaintiff sat "comfortably on the chair throughout the process of obtaining her history and was able to

rise from the chair and move about the room without evidence of hesitation or restriction." (Tr. at 443.)

Dr. Friedland reviewed Plaintiff's medical records, and noted that after her injury on March 23, 1993,

Plaintiff was seen by four different doctors between her injury date and April 22, 1994. (Tr. at 445.) Dr.

Friedland noted that Plaintiff was "apparently then referred by her attorney to be seen by Dr. A.V.

Anderson at the Pain Assessment and Rehabilitation Center [and] . . . was first seen . . . on 8/11/94." (Tr.

at 445.) After reviewing all of the evidence in her medical records and his own examination, Dr. Freidland

stated

> It would be my opinion . . . that the patient had reached maximum medical improvement
> with respect to her cervical condition as of at least 3/26/99 when she was advised to
> resume normal activities by Dr. Simmons of the Twin City Spine Center and advised to
> return to work as of 4/4/99. I do not believe that she has required any further or ongoing
> care or treatment with respect to her cervical condition since having reached maximum
> medical improvement on 3/29/99 . . . I do not believe that she would benefit from any
> further passive treatment or modalities including trigger point injections, massage or
> manipulations or any type with respect to her cervical condition. I also do not believe that
> [Plaintiff] requires any further diagnostic studies including the MRI scan requested by Dr.
> Anderson on 1/30/02. It is certainly my opinion that [Plaintiff] is not permanently and
> totally disabled from any and all future employment. It is my opinion that since having
> reached maximum medical improvement on 3/29/99 that [Plaintiff] has been capable of
> working within restrictions of no lifting more than 20 pounds occasionally or ten pounds
> more frequently and no lifting above shoulder level. She should also be restricted to
> avoidance of prolonged or static positioning of the head and neck in extremes of
> hypertension or hyperflexion as well as avoidance of rapid and repetitive rotation of the
> head and neck. Within these restrictions, it is my opinion that [Plaintiff] is capable of full
> time employment since . . . 3/29/99.

(Tr. at 448.)

On May 23, 2002, Plaintiff underwent a psychiatric evaluation at the request of Plaintiff's former

employer, by Dr. Keith Hartman. (Tr. at 433-40.) Dr. Hartman noted that Plaintiff "walked easily and

showed no difficulties with seated posture for the first thirty minutes of the interview. Then she began

shifting around in her seat, and about every 15 minutes would stand to walk around."  (Tr. at 433.)

> Dr. Hartman opined that Plaintiff gave

> a believable account of anxiety and depressive disorder.  I have no information she suffered from this difficulty before 1998.  She has been treated only with one antidepressant, and this in moderate doses only . . . The patient's account today is of much more psychological distress than indicated in any records from Dr. Anderson or his associates.  I cannot separate depression/anxiety caused by pain from that caused by narcotics administration itself . . . A guiding rule in the treatment of chronic pain is to avoid narcotics whenever possible, use them sparingly if absolutely necessary.  This is not the direction Dr. Anderson has gone, however.

(Tr. at 438.)  Dr. Hartman diagnosed Plaintiff with chronic pain disorder, generalized anxiety disorder

"possibly due to narcotics administration . . . spinal problems per orthopedics, chronic headaches, [and]

cognitive inefficiency due to narcotics administration."  (Tr. at 439.)

In addition to offering these diagnoses, Dr. Hartman also responded to several questions put to him

by James Schaps, an attorney representing the employer in the Worker's Compensation action, who

requested the evaluation.  Dr. Hartman stated that he believed Plaintiff "Generalized Anxiety Disorder.  A

certain amount of depression is contained within the major diagnosis of Pain Disorder, and I do not think

the patient's mood disorder exceeds the average in this category."  (Tr. at 439.)  In Dr. Hartman's opinion,

Plaintiff's

> psychiatric condition is hampered less by depression or anxiety than the mental fogginess she suffers from pain killers.  This eliminates occupations she could otherwise handle- those requiring good memory, the ability to think sequentially, and so forth.  Off narcotics, I would not see her as restricted in the workplace by psychiatric or psychological issues.  Whether she could work full-time would depend entirely on her ability to control pain.

(Tr. at 440.)

On June 15, 2002, Plaintiff was seen by Dr. Berk who noted that Plaintiff's "cognitive deficits make

a non-physical job impossible for her.  The aftermath of surgical interventions and chronic pain make a

physical job impossible [as well]."  (Tr. at 391.)  Dr. Berk further noted that Plaintiff's "depression [was]

severe" and that "her GAF Scale score [was] a 48."  (Tr. at 391.)  Plaintiff also saw Dr. Anderson again

on June 28, 2002.  (Tr. at 421.)  At the time of her visit, Dr. Anderson noted that Plaintiff reported that Dr.

Hartman "made some rather derogatory statements about the treatment she has received from this facility."

(Tr. at 421.)  Dr. Anderson opined that Plaintiff was

> taking a comparatively low dose of morphine, particularly considering the amount of
> problems she has had with her neck, as well as her headaches.  She has done well with this
> medication regimen and feels that without the medication she would not be able to continue
> with her job . . . She states that before we had her on the medication regimen that she was
> in 'excruciating pain.'  She now feels that she is able to function at a reasonable level at her
> activities of daily living and some recreational activities, albeit a few, as well as being able
> to function in relationships with other people, better than she would without the medication.

(Tr. at 421.)

Plaintiff returned to Dr. Anderson on October 9, 2002, and Dr. Anderson noted that she had been

"working approximately three hours per day, though finds that there are times when even this is quite

difficult to manage."  (Tr. at 420.)  Dr. Anderson noted that Plaintiff was experiencing some escalation in

panic attacks, and he recommended that she continue taking the medications prescribed to her.  (Tr. at

420.)  Dr. Anderson also stated that Plaintiff's combination of medications allowed Plaintiff to be "far more

functional than what she can be without them.  Her pain levels are much lower, and her quality of life is

higher."  (Tr. at 420.)

On March 12, 2003, Dr. Anderson performed a physical capacities evaluation on Plaintiff, and

determined that she was restricted to sitting, standing and walking for a half and hour at a time, and that she

could only sit and stand one hour in an eight hour day, and walk two hours in an eight hour day.  (Tr. at

405.)  Dr. Anderson determined that Plaintiff could occasionally lift up to five pounds from the floor, could

occasionally lift up to ten pounds from table height, and could occasionally carry up to ten pounds.  (Tr.

at 405.)  Dr. Anderson opined that Plaintiff was occasionally able to bend and climb but was not able to

squat, crawl reach or pull.  (Tr. at 405.)  Dr. Anderson also noted that Plaintiff was moderately restricted

in activities which involved exposure to marked changes in temperature and humidity, was mildly restricted

in activities that involved driving automobile equipment, was totally restricted from engaging in activities

involving sustained positions, and was moderately restricted from engaging in activities involving side to side

bending and rotation of the upper body.  (Tr. at 405.)

On April 25, 2003, Dr. Anderson noted that Plaintiff's physical restrictions were the same, and that

she could not stand or walk for more than thirty minutes at a time, and could not sit for more than ten to

fifteen minutes at a time.  (Tr. at 427.)  Plaintiff continued to see Dr. Anderson in the spring and summer

of 2003.  (Tr. at 460-77.)

On September 3, 2003, Plaintiff was seen by Dr. Anderson, who noted that

without the medication she would not be able to continue with her work efforts nor would
she be able to recreate at all.  The pain complex, however, has interfered with her
socialization, housework, and the full time work that she enjoyed very much.  She is now
capable of sitting for about 10 to 15 minutes, standing for 10 to 15 minutes and walking
for 10 to 15 minutes.  She is presently working part-time, two to three hours four days a
week.

(Tr. at 459.)

On December 22, 2003, Plaintiff reported that she was still finding that her social activities were

significantly affected by her pain.  (Tr. at 493.)  Dr. Anderson noted that she could only sit, stand or walk

for ten to fifteen minutes at a time, and that Plaintiff moved about frequently during her visit with him.  (Tr.

at 493.)  Plaintiff also noted that she had difficulty sleeping because of her pain, and that this had been

"going on for quite some time."  (Tr. at 493.)  Dr. Anderson noted that he would continue Plaintiff on her

same medication regimen, because the regimen "at least has afforded her some relief and has increased her

overall ability to function."  (Tr. at 494.)

### C.    Plaintiff's Testimony

Plaintiff testified twice in this matter.  At the first hearing on May 13, 2003, Plaintiff testified that

she had a valid Minnesota drivers license, and was living with her fiancé.  (Tr. at 585.)  Plaintiff testified that

she sustained an injury on March 23, 1993, when she moved some office furniture, and that this injury

resulted in a workers compensation claim that was resolved in November 2000.  (Tr. at 586-87.)  Plaintiff

testified that she received her first surgery on March 21, 1997, which was an anterior cervical spinal fusion.

(Tr. at 587.)  Plaintiff testified that her second surgery was performed on February 12, 1999, and that both

surgeries were performed by Dr. Garvey.  (Tr. at 588.)  Plaintiff testified that she was working as a senior

companion for River Valley Home Care, approximately two to three hours per day, four days per week,

and had been doing so since July of 2000.  (Tr. at 588-89.)  Plaintiff testified that she received a monthly

income of approximately $400.00 from this employment.  (Tr. at 588.)  Plaintiff testified that before this

employment she worked for Ramsey Action Programs full time from 1994 until March 1999.  (Tr. at 590.)

Plaintiff testified that she was terminated from this job after her second surgery because her recovery time

was too long.  (Tr. at 590-91.)  Plaintiff testified that she suffered from headaches weekly, and stated that

on a scale of one to ten an average headache produced a pain score of eight.  (Tr. at 593.)  Plaintiff testified

that she experiences panic attacks and that she has trouble sleeping because of her neck, back and hip pain,

and that her prescription for Ambien only helps part of the time.  (Tr. at 594-95.)  Plaintiff testified that she

15

took twenty-seven different medications per day.  (Tr. at 601.)  Plaintiff testified that she tried at one point

to stop her use of morphine, but that she "continued to have excruciating pain so Dr. Anderson put [her]

back on morphine."  (Tr. at 601.)  Plaintiff testified that Dr. Friedland did not physically examine her and

that Dr. Curran did not conduct any psychiatric testing on her.  (Tr. at 610.)  The ALJ subsequently issued

a decision finding that Plaintiff was not disabled.  (Tr. at 59.)  On September 16, 2003, The Appeals

Council remanded the case back to the ALJ.  (Tr. at 84-86.)

On February 12, 2004, Plaintiff testified at the second hearing on this matter.  (Tr. at 541-64.)

Plaintiff testified that, since the previous hearing, she had not had any hospitalizations or surgeries, and had

recently settled her workers compensation claim.  (Tr. at 541.)  Plaintiff testified that she continued to work

at River Valley Home Care two to three hours a day, four days a week.  (Tr. at 542.)  Plaintiff testified that

she continued to see Dr. Anderson and that she was also seeing a psychologist and a psychiatric nurse for

mental health treatment.

### D.    Medical Expert's Testimony

Dr. Mary Louise Stevens, testified at the hearing on this matter on February 12, 2004.  (Tr. at

543.)  Dr. Stevens was hired as a medical expert by the Social Security Administration in response to the

direction of the Appeals Council on remand.  (Tr. at 544.)  Dr. Stevens testified that Plaintiff was limited

to tasks that involved "simple, repetitive, unskilled work activities and brief and superficial contact with

others."  (Tr. at 559.)  Dr. Stevens further testified that, taking into account the restrictions outlined above,

that she did not believe Plaintiff's psychological impairments limited Plaintiff's ability to perform at a

competitive rate and pace on a five day a week, eight hour a day, forty hour a week basis.  (Tr. at 559.)

Dr. Stevens did not address Plaintiff's physical impairments.  (Tr. at 559.)

16

### E.    Vocational Expert's testimony

Barbara Wilson-Jones testified as the vocational expert ("VE") at the first hearing on May 13,

2003.  (Tr. at 603.)  The ALJ asked the VE to consider a hypothetical person with

> physical restrictions . . . [of] ten pounds occasionally and frequently stand at least two
> hours in an eight hour day, sit six, limited in upper extremities and . . .avoid frequent
> overhead motion with both arms, avoid hazardous machinery and heights. Psychological
> limitations would . . . limit her to routine repetitive three or four step uncomplicated
> instructions . . .[b]rief, superficial, infrequent contact, public, co-workers, supervisors. As
> long as we stick with routine/repetitive, stress handling ability would be adequate for
> routine/repetitive work.

(Tr. at 605.)  The VE testified that such a person would not be able to perform her previous past relevant

work as an administrative assistant.  (Tr. at 605.)  The VE further testified that such a person could perform

the job of surveillance monitor, as that job is unskilled and sedentary, with the ability to sit or stand at will

so long as the person looks at the monitor.  (Tr. at 606-07.)  The VE testified that there were about 2,000

surveillance monitor jobs available.  (Tr. at 607.)  In addition, the VE testified that the hypothetical person

could perform the job of touch up screener, of which 2,300 jobs were available, or the job of telephone

order clerk, both of which are sedentary and unskilled jobs.  (Tr. at 607.)  The VE further testified that such

a person could perform the job of charge account clerk, and that there were 2,500 such jobs available.

(Tr. at 607.)

Mr. Robert Brezinski testified as the vocational expert at the second hearing on this matter.  (Tr.

at 562.)  The ALJ asked Mr. Brezinski to consider an individual with

> unlimited to very good ability to follow work rules and a good ability to relate to
> coworkers.  She'd have good abilities to use judgment, interact with supervisors, and a fair
> ability to deal with work stresses, function independently, and maintain concentration.  A
> fair ability on complex and good to fair on detailed but not complex.  A good ability on
> simple.  Given her current emotional status, due to a tremendous amount of stress in her

17

> personal life I'm concerned about adding work stress.  Unlimited to very good on personal appearance.  And fair to emotionally stable, relate predictably, demonstrate reliability. Currently struggling with increased depression.  Can manage her benefits in her own best interest.  She'd be further limited to simple, repetitive, low-stress routine work with brief infrequent superficial contact with the public, coworkers, and supervisors.  This was the more abbreviated opinion of Dr. Stevens as testified to.

(Tr. at 564.)  When asked whether such a person could perform the job of administrative assistant, the VE stated that he did not believe such a person could do so, because such work is skilled work that is above what the "correct hypothetical" is.  (Tr. at 564.)  The VE testified that his opinion was "strictly from the psychological perspective . . . without regard to any physical or exertional limitations."  (Tr. at 564.)

The ALJ further asked the VE to consider an individual, with the above noted psychological limitations, who also had

> an ability to do light work at the regulatory level that would be 20 pounds occasionally, 10 pounds frequently, sit stand would be six hours and . . . avoidance of over-shoulder work . . . No prolonged or static positioning of head or neck in extreme of hyperextension or hyper reflection, avoidance of rapid repetitive motion of the head or neck.

(Tr. at 565.)  The VE opined that such an individual could perform the job of "production assembly" which has "14 to 15,000 [jobs] that would be suitable [for the person in the hypothetical.]" (Tr. at 566.)  The VE also stated that there were a total of "25 to 27,000" cashier positions that would be appropriate for such a person.  (Tr. at 566.)

The ALJ posed a second hypothetical to the VE, with the same psychological limitations as previously noted, but with "a reduced physical RFC down to 10 pounds occasionally and 10 pounds frequently.  Performing standing two hours, sit six.  No frequent overhead motion of arms.  No hazards, machinery or heights.  Simple, routine, repetitive three and four-step.  Brief infrequent superficial contact with the public, coworkers, and supervisors."  (Tr. at 566.)  When faced with this hypothetical, the VE

noted that he would reduce the number of appropriate assembly jobs from 75,000 to between 5,000 and 6,000. (Tr. at 566.) The VE also noted that "there are cashiering positions in the sedentary occupation . . . The number would of course be significantly reduced but . . . there would be three to 4,000 of those in the region. Additionally, there would be surveillance system monitor . . . and I would estimate there would be 1,000 of those in the region." (Tr. at 566-67.)

The third hypothetical posed to the VE by the ALJ included the same psychological and exertional restrictions as the previous hypothetical, but included the additional element that the person is unable to attend work on a full time basis. (Tr. at 567.) The ALJ noted that such a person would only be able to work for four hours per day at the sedentary level, and that such a person, during an eight hour day, could endure an hour of sitting, an hour of standing, and two hours of walking, which was consistent with Dr. Anderson's assessment of Plaintiff. (Tr. at 568.) The VE noted that, given those restrictions, competitive work would not be possible. (Tr. at 568.)

On cross-examination, Plaintiff's attorney asked the VE where he got the numbers for the surveillance monitor position. (Tr. at 569.) The VE stated that

> surveillance system monitor is not listed in the information produced by the Minnesota Department of Labor or by the Workforce Center. They do list security guard however and that I would list as a part of the security guard position. For example, they indicate that there's approximately – in the year 2000 there were 14,216 security guard jobs and they estimated there would be 18,902 by 2010. So there's approximately 15,000 security guards. But the vast majority of those obviously are people who are going to be up and about and moving and – but there are surveillance system monitors and I would just limit it to the number I gave.

(Tr. at 570.) When asked how the VE determined how he determined what subset of security guard positions were surveillance system monitors, he stated "so I'm saying that security guard would be under

19

that general category of security guards.  Surveillance system monitor would be under the internal category

of security guard but it would be a small percentage of it."  (Tr. at 570.)  When asked what reference the

VE used to determine the numbers of this position available in the economy, the VE stated that he used

"[t]he numbers from the Workforce Center and its Minnesota Employment Outlook by Occupation 2000

to 2010."  (Tr. at 570.)  The VE testified that the numbers from the Workforce Center did not break the

security guard jobs down according to light, sedentary, and medium work, and that he had never done any

market surveys himself on the position of security monitor.  (Tr. at 570.)

Plaintiff's attorney asked the VE to read the DOT description of the assembly job that the VE

opined that Plaintiff could perform.  (Tr. at 570.)  The VE stated that this type of sedentary job would be

"the final assembler like on optical goods [and would be required to] attach[ ] nose pads and temple pieces

to optical frames using hand tools, position[ ] parts and fixtures to align screw holes, insert[ ] and tighten[]

screws using screwdriver."  (Tr. at 571.)  The VE testified that a person with the assembler position would

be working in a cubicle, or in a general open area at a desk or a bench.  (Tr. at 571.)  When asked to be

more descriptive about how a person working the job of assembler would position themselves for the job,

the VE responded

> typically when they talk- - when someone talks about no static positioning of the neck I'm
> - - I typically think of someone looking into a microscope doing work under a microscope.
> When I'm seeing someone doing work in front of their hands the neck - - I mean when you
> can turn your head and your neck its not static.

(Tr. at 572.)  When Plaintiff's attorney pointed out that such an assembler would typically be working with

small tools, the VE responded "Yeah, but you could reach over here, get this tool, work in it here, put it

down over there/ I mean your're - - it's a variety of- - it's not as if you're looking in one spot for a

prolonged period of time." (Tr. at 572.)

The VE testified that the numbers for the assembly and cashier jobs both came from the Workforce Center and its Minnesota Employment Outlook by Occupation 2000 to 2010. (Tr. at 572.) The VE testified "when I talk about -cashier comes- is listed as a specific occupation. Assembly, they- there are a variety of assembly jobs listed there but not to the detail that they would list out the number of ones that I've indicated in say for example the optical area." (Tr. at 572.) The VE testified that he had not done market studies on either the assembly job nor the cashier position. (Tr. at 572.)

### F.     The ALJ's Decision

On September 16, 2003, the Appeals Council remanded the case back to the ALJ for further determination. (Tr. at 84-86.) The Appeals Council concluded that the ALJ's original opinion, dated August 24, 2004, did "not satisfy the requirements set forth in the Social Security Administration regulations and the Social Security Rulings." (Tr. at 84-86.) The Appeals Council noted that the ALJ's opinion did

> not contain an adequate evaluation of the claimant's alleged or reported mental impairments in accordance with the provisions set forth in 20 CFR 404.1520a and 416.920a. While the [ALJ] determined that the claimant's depression and panic attacks were severe, and that the degree of functional limitations did not satisfy section 12.04B of the Listings . . . the decision [did] not contain an evaluation of the claimant's panic attacks under section 12.06 of the Listings and is not specific regarding the degree of limitations under the 'B' criteria.

(Tr. at 84.) The Appeals Council Remand Order also noted that the ALJ's "decision [did] not contain or address the opinions expressed by the claimant's treating source, Ronald Berk, L.P. . . . and John Curran, M.D. . . . or explain the weight given to such opinions." (Tr. at 84.) The Appeals Council noted that further evaluation of Plaintiff's mental impairments was warranted, and that on remand the ALJ should take appropriate action to resolve these issues. (Tr. at 85.)

The ALJ issued his second decision on this matter on August 24, 2004.  (Tr. at 24-36.)  The ALJ determined that Plaintiff met the disability insured status requirements of the Act at all times from the date of onset through December 31, 2005 and was therefore entitled to disability coverage at all relevant times. (Tr. at 25.)

The ALJ engaged in the five-step sequential analysis to determine whether Plaintiff is disabled, as required by 20 CFR 404.1520 and 416.920.  (Tr. at 25.)  The ALJ held that Plaintiff had not engaged in substantial gainful activity since December 31, 1998, as her income did not rise to the level of substantial gainful employment.  (Tr. at 25.)  Looking at the next step of the sequential analysis, the ALJ concluded that

> [t]he objective medical record establishes a history of a cervical fusion at C4-C7 and decompressive laminotomies at C5-C6 (1999) with residual discogenic pain syndrome, myofascial syndrome, posttraumatic cervicogenic headaches, probable facet syndrome and symptoms of thoracic outlet syndrome, bilateral piriformis syndrome versus deep gluteal bursitis and possible adhesion formation secondary to surgery.

(Tr. at 26.)  The ALJ concluded that "[t]hese physical conditions impose exertional limitations in the claimant's ability to perform work related tasks."  (Tr. at 26.)

The ALJ concluded that

> the objective medical record also establishes that mental conditions affect the claimant's ability to work.  The regulations . . . require the [ALJ] follow a special procedure in the evaluation of mental impairments.  This procedure requires determinations of the existence and limitations resulting from any mental impairment as described in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4.  This process starts with an assessment of the A Criteria (a set of medical findings), and if the A criteria are met, the B (and sometimes C) criteria (a set of impairment-related functional limitations).

(Tr. at 26.)  The ALJ then reviewed the medical evidence in the record, noting that Dr. Curran, assessed Plaintiff with "an adjustment reaction related to her physical condition in December 2001."  (Tr. at 26.)

The ALJ also noted that "[i]n April 2002, [Plaintiff] was diagnosed with an adjustment disorder with depression and anxiety and a panic disorder with agoraphobia by psychologist, Ronald Berk." (Tr. at 26.) The ALJ noted that, in order to assist in the evaluation of Plaintiff's mental impairments, the ALJ arranged for the testimony of Dr. Stevens, the neutral medical expert. (Tr. at 26.) Based on Dr. Steven's testimony, the ALJ concluded that, "under the analysis required by the A criteria, the overall evidence demonstrates the existence under Listings 12.04 and 12.06 of the medically determinable mental impairments of an adjustment disorder with depression, a panic disorder and an anxiety disorder." (Tr. at 26.) Since the A criteria was met, the ALJ proceeded to determine the degree of limitations those impairments imposed under the B or C criteria. (Tr. at 26.)

The ALJ reviewed the opinions submitted by Dr. Curran, Dr. Hartman, and Psychologist Ronald Berk, and concluded that

> [g]iven these facts, under the B criteria and consistent with the conclusions of the State Agency Psychological Consultants, and supported by the testimony of the medical expert, the undersigned finds mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. In addition there is no evidence of the 'C' criteria or an established residual disease process likely to cause decompensation or a history of inability to live outside a highly supportive living arrangement.

(Tr. at 27.) The ALJ concluded that

> when considering the claimant's functional limitations, the above findings under the procedures used to evaluate mental conditions are sufficient to find that she is subject to the severe impairments of a Listing 12.04 and a Listing 12.06 adjustment disorder with depression, a panic disorder and an anxiety disorder in addition to her severe physical impairments.

(Tr. at 27.) However, the ALJ stated "the above findings do not establish the severity required to meet any

23

mental impairment listing . . . The [ALJ] finds that [Plaintiff] does not have any impairment or combination

of impairments that meets or is medically equivalent to any impairment listed in Appendix 1, Subpart P,

Regulations, No. 4." (Tr. at 28.) Therefore, the ALJ determined that "the remaining issue in the sequential

evaluation is whether [Plaintiff] has a residual functional capacity that permits the performance of relevant

past work or any other work existing in significant numbers in the national economy." (Tr. at 28.)

The ALJ concluded that, after reviewing the evidence in the record and the testimony at the hearing,

since December 31, 1998, Plaintiff retained the RFC for

> low stress routine simple repetitive three-to-four step sedentary tasks with brief and
> superficial contact with the public, co-workers and supervisors at the sedentary exertional
> level work and not overhead work and no work around hazardous, machinery or heights.
> Sedentary work is defined as work lifting 10 pounds frequently, standing and walking 2 of
> 8 hours, and sitting 6 of 8 hours.

(Tr. at 28) (citing 20 C.F.R. § 404.1567 and 416.967.) In making this determination, the ALJ considered

Plaintiff's subjective complaints of pain and found that Plaintiff "was not credible that her impairments

preclude all substantial work activity due to significant inconsistencies in the record as a whole." (Tr. at

29.) The ALJ concluded that the treatment record and objective medical evidence were inconsistent with

"either impairments of such severity or symptoms of any intensity, frequency, or duration, which would

required greater [RFC] reductions." (Tr. at 29.) The ALJ stated that

> [t]he medical opinions of record are inconsistent with a conclusion of disability. There are
> inconsistencies with [Plaintiff's] daily activities, work record, and other factors that do not
> support the need for further [RFC] considerations. When considering [Plaintiff's]
> allegations in light of the overall record, the [RFC] fully accommodates the degree any
> precipitating or aggravating factors contribute to work limitations.

(Tr. at 29.)

The ALJ noted that, on March 29, 1999, Plaintiff was seen by Dr. Timothy Garvey at the Twin

24

Cities Spine Center, that Dr. Garvey reported that Plaintiff had not felt that well in years, that Plaintiff

denied any pain in her neck or upper extremities, and that Dr. Garvey gave her a return to work slip at that

time. (Tr. at 29.) The ALJ stated Dr. Anderson's notes on January 8, 2003, reflected that Plaintiff

reported that her pain was reduced and her daily functioning was improving, and that she had improved

enough to take part in a daily exercise program that improved her flexibility and conditioning. (Tr. at 29.)

The ALJ noted that when Plaintiff went to see Dr. Anderson in March 2003, Dr. Anderson reported that

"although [Plaintiff] had pain and tenderness in her neck and cervical spine, she had normal neurological

function and normal sensory, strength, coordination and reflex examinations." (Tr. at 29.) The ALJ stated

that, during this same visit, Dr. Anderson "noted that the current medical regimen should continue, which

suggest[ed] that [Plaintiff's] medical condition was stable." (Tr. at 29.) The ALJ further noted that

throughout 2003 Dr. Anderson opined that Plaintiff's medical regimen should continue because "it was

successful in reducing her symptoms and improving her overall functioning." (Tr. at 29.) The ALJ

determined that "Dr. Anderson's medical records suggest that [Plaintiff's] symptoms were reduced with

conservative treatments on a long term basis and do not support further reduction in the [RFC]." (Tr. at

29.) The ALJ further noted that Plaintiff had an MRI on her right hip in January 2003, and that this MRI

"showed no evidence of joint effusion, subluxation or bursitis and her SI and hip joints were symmetric in

appearance and demonstrate normal morphology." (Tr. at 29.)

The ALJ noted that in March 2003, Dr. Anderson limited Plaintiff to "lifting 10 pounds, sitting one

hour per day, standing one hour per day and walking two hours per day and occasional bending and

climbing and no exposure to unprotected heights, moving machinery and dust, fumes or gases." Tr. at 30.)

The ALJ noted that Dr. Anderson was Plaintiff's treating physician, and hence his opinion regarding the

nature and severity of Plaintiff' impairments should be given controlling weight "provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the file." (Tr. at 30.) Taking that into account, the ALJ gave "great weight to Dr. Anderson's opinion that [Plaintiff] is able to lift 10 pounds and she should not be exposed to unprotected heights and moving machinery" and the ALJ incorporated these restrictions into the RFC accordingly. (Tr. at 30.) However, the ALJ determined that there were "no objective findings in the record to support that [Plaintiff] should not be exposed to dust, fumes or gases." (Tr. at 30.) The ALJ further stated that he gave

> no weight to the limit of three hours of work per day set by Dr. Anderson, because it is not well supported by medically acceptable clinical and laboratory diagnostic techniques and it is inconsistent with [Dr. Anderson's] own medical records that reflect that her pain levels have decreased and her functional abilities have increased with ongoing treatment.

(Tr. at 30.)

The ALJ also reviewed the independent medical examination conducted by Dr. Friedland on May 13, 2002. The ALJ noted that, after review of the diagnostic tests and his examination of Plaintiff, Dr. Friedland opined that Plaintiff was

> not permanently and totally disabled from any and all future employment and she is capable of working fulltime within the restrictions of no lifting of 20 pounds occasionally and 10 pounds frequently and no lifting above the shoulder level. In addition, she should be restricted from static head and neck positions and hyperextension or hyperflexion as well as avoidance of rapid and repetitive rotation of the head and neck.

(Tr. at 30.) The ALJ gave weight to Dr. Friedland's opinion "to the extent that the diagnostic tests and clinical examination results demonstrated that [Plaintiff's] condition was stable and allowed for a return to gainful work and she should not lift above the shoulder level." (Tr. at 30.) However, the ALJ noted that

Dr. Friedland did not have an opportunity to review all of the objective medical evidence and he did not hear Plaintiff's testimony at the hearing, which the ALJ determined supported a further reduction of the RFC to a range of tasks within the sedentary exertional level.  (Tr. at 30.)

The ALJ gave great weight to the opinion of the State Agency Medical Consultants opinion, which limited Plaintiff to the sedentary exertional level with no repetitive overhead activities and avoiding concentrated exposure to hazardous machinery and heights.  (Tr. at 30-31.)  The ALJ gave this opinion great weight because it was consistent with the objective findings in the record and it was based on a review of diagnostic tests and the results of clinical examinations.  (Tr. at 31.)

The ALJ next reviewed the objective medical evidence, course of treatment and medical opinions related to Plaintiff's severe mental impairments.  (Tr. at 31.)  The ALJ noted that Dr. Stevens reviewed the objective medical evidence and Plaintiff's testimony, and she opined that Plaintiff's mental impairments "would limit her to simple unskilled tasks with brief and superficial contact with others."  (Tr. at 31.)  The ALJ noted that Dr. Stevens reviewed the records completed by Plaintiff's psychologist, Tanya Ibragic, that the ALJ himself read aloud the limitations stated by the psychologist, and that Dr. Stevens stated that the restrictions set by Plaintiff's psychologist "were in a global context consistent with the restrictions she set forth." (Tr. at 31.)  The ALJ determined that Dr. Steven's analysis was well-supported by the record. (Tr. at 31.)  The ALJ gave significant weight to the work restrictions set forth by Ms. Ibragic and Dr. Stevens, and incorporated those limitations into the RFC.  (Tr. at 31.)

The ALJ noted that he gave greater weight to the opinion of the medical expert than he did to the State Agency Psychological Consultants, but that the limitations set forth by the State Agency Psychological Consultants were generally consistent with the overall record.  (Tr. at 31.)  The ALJ noted that in June

2002 Plaintiff's therapist, Dr. Berk, gave her a GAF scale score of 48 and stated that Plaintiff could not

hold a job.  (Tr. at 32.)  The ALJ gave this opinion

> little weight because during the same month [Dr. Berk's] therapy notes reflect that [Plaintiff] reported that she can control her panic attacks, she felt less stressed, her concentration had improved, her anger and irritability was reduced, her pain levels were down, she no longer felt hopeless, she had a greater sense of control, she was more active and her appetite had improved.

(Tr. at 32.)  The ALJ concluded that Dr. Berk's medical records were "inconsistent with a finding that

[Plaintiff] is unable to perform all work, but they are consistent with the limitations set forth" in the RFC.

(Tr. at 32.)

The ALJ gave great weight to the opinion of Dr. Keith Hartman, "because of his expertise in the

diagnosis and treatment of mental impairments and because as a psychiatrist his training is extensive and

comprehensive related to mental impairments."  (Tr. at 32-33.)  The ALJ noted that "Dr. Hartman's

opinion that [Plaintiff] seek other modalities for pain relief is supported in the record by Dr. Mark Friedman

[sic], who noted that he would specifically advise against the chronic and prolonged use of the very strong

narcotic medications."  (Tr. at 33.)

The ALJ found that Plaintiff's daily activities were inconsistent with her request for a reduced RFC.

(Tr. at 33.)  The ALJ further noted that Plaintiff's work record was inconsistent with an allegation of

disability, because the years prior to her alleged onset date were "posted with limited or low earnings."

(Tr. at 33.)  The ALJ noted that Plaintiff continued to work as a senior aide on a part time basis, and that

showed some work motivation, but that Plaintiff's "anticipation of the receipt of disability benefits and the

receipt of family support and Worker's Compensation may constitute economic disincentives for [Plaintiff]

to return to work."  (Tr. at 33.)

Taking into consideration all of the evidence, the ALJ concluded that the RFC fully accommodated the degree any precipitating and aggravating factors contribute to Plaintiff's work limitations.  (Tr. at 33.) The ALJ noted that he considered Plaintiff's testimony of pain and depression and, as a result, limited the RFC "to a range of sedentary work . . . with limits of low stress routine simple repetitive three-to-four step sedentary tasks with brief and superficial contact with the public, co-workers and supervisors."  (Tr. at 33.) The ALJ noted that, while he acknowledged that Plaintiff has severe impairments that cause a credible degree of pain or other limitations in her ability to work, the fact that working "may cause pain or discomfort does not mandate a finding of disability."  (Tr. at 33.)

After determining the appropriate RFC, the ALJ moved on to consider whether the RFC permitted Plaintiff to perform her past relevant work.  (Tr. at 33.)  The ALJ concluded that Plaintiff could not perform her past relevant work.  (Tr. at 34.)  The ALJ noted that such a finding "shifts the burden of proof to the Social Security Administration to show there is other work existing in significant numbers in the national or regional economy [that Plaintiff] could perform given her age, education, past relevant work, and [RFC.]" (Tr. at 34.)  The ALJ noted that Plaintiff was 47 years old at the time of the hearing, and hence, under the regulations, was considered a younger individual.  (Tr. at 34.)  Plaintiff has a high school equivalent education, and no transferrable skills within her present RFC.  (Tr. at 34.)  The ALJ requested the VE to consider an individual of Plaintiff's age, education, past relevant work experience and RFC, and asked the VE to determine whether any other jobs existed in either the national or regional economy that such a person could perform.  (Tr. at 34.)  The VE testified that such an individual could perform an assembly job, specifically assembling optical, electrical and small products, and that there were approximately 6,000 assembly jobs available in Minnesota.  (Tr. at 34.)  The VE further testified that such an individual could

perform the jobs of cashier and surveillance system monitor, and that 4,000 cashier jobs and 1,000 surveillance monitor jobs existed in the Minnesota economy.  (Tr. at 34.)  The VE testified that "these numbers represented the reduced total from all such positions after consideration of all the [RFC] criteria." (Tr. at 34.)  The ALJ determined that the VE's report was "consistent with the jobs, standards, and descriptions found in the current <u>Dictionary of Occupational Titles (DOT)</u>."  (Tr. at 34.)  The ALJ determined that the VE's testimony was credible, persuasive and uncontradicted, and that the Commissioner met its burden to prove that other work exists in significant numbers in the national or regional economy that Plaintiff could perform.  (Tr. at 34.)  Since the ALJ determined that there is other work that exists in significant numbers that Plaintiff could perform, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act at any time relevant to her applications of November 27, 2001.  (Tr. at 34.)

## III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  <u>See</u> 42 U.S.C. § 405(g); <u>see also</u> <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir.1998); <u>Gallus v. Callahan</u>, 117 F.3d 1061, 1063 (8th Cir.1997); <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (8th Cir.1989).  Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co., v. NLRB</u>, 305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  <u>See</u> <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir.1999); <u>see</u> <u>also</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184 (8th Cir.1989) (citing

Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir.2000); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently. Roberts v. Apfel, 22 F.3d at 468. (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir.1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir.1996). The Court must "defer heavily to the findings and conclusions of the SSA." Howard v. Massanari, 255 F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In making the disability determination the Secretary promulgated a sequential evaluation process which applies to both physical and mental disorders. 20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. The disability determination requires a step-by-step analysis. See 20 C.F.R. §404.1520(a). At the first step, the ALJ must consider Plaintiff's work history. At the second step, the ALJ must consider the medical severity of Plaintiff's impairments.

At the third step, the ALJ must consider whether Plaintiff has an impairment or impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations.  See 20 C.F.R. 404.1520(d).  If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past relevant work.  If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled.  If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir.2000).

## IV.  CONCLUSIONS OF LAW

### A.    The ALJ Did Not Give Good Reasons For Disregarding The Opinions of Plaintiff's Treating Physician, Dr. Anderson.

According to the Code of Federal Regulations, a treating physician's opinion is to be afforded "controlling weight" when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  Under the regulations, a "treating source" is a physician, psychologist, or other acceptable medical source who has an "ongoing treatment relationship" with the claimant, i.e., the claimant has seen the physician "with a frequency consistent with accepted medical practice" for the condition.  See 20 C.F.R. § 404.1502. Under the Social Security regulations, an ALJ considers the following factors in deciding what weight to give a particular medical opinion: (1) the examining relationship; (2) the treatment relationship, considering the length, nature and extent of the treatment relationship; (3) the extent to which

the opinion is supported by medical evidence; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is that of a specialist on issues relating to his or her specialty, and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(1)-(6). Generally, the opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). The ALJ is required to give more weight to the opinion of a treating source versus a non-treating source. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even where a treating physician's opinion is not afforded "controlling weight", "a treating physician's opinion should be accorded substantial weight." Prince v. Bowen, 894 F.2d 283, 285 (8th Cir.1990).

The Eighth Circuit has stated "[g]enerally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if . . . the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir.2001); see also Lanning v. Heckler, 777 F.2d 1316, 1318 (8th Cir.1985) (quoting Hancock v. Secretary of Dept. of Health, Educ. and Welfare, 603 F.2d 739, 740 (8th Cir.1979)) However, "[t]he conclusions of any medical expert may be rejected 'if inconsistent with the medical record as a whole.'" Davis v. Apfel, 239 F.3d 962, 967 (8th Cir.2001)(quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir.1995)). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000). No matter what weight the ALJ determines should be afforded the treating physician's opinion, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed

v. Barnhart, 399 F.3d 917, 921 (8th Cir.2005)(quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ may give special weight only to a practitioner's medical judgment about the nature and severity of a claimant's impairments.  20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2).  If a medical practitioner expresses an opinion on an issue that is reserved to the Commissioner, such as the claimant's RFC, whether a claimant is disabled, or whether the claimant meets a Listing, the ALJ must consider the opinion, but Social Security regulations expressly bar the ALJ from giving any special significance to the source of the opinion, and it is never entitled to controlling weight.  20 C.F.R. §§ 404.1527(e)(3); SSR 96-5p.

However "medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing . . . and . . . it may be necessary to decide whether to adopt or not adopt each one."  SSR 96-5p.  A claimant's RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect . . . her capacity to do work-related physical and mental activities."  SSR 96-8p.  The RFC is an assessment of the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  SSR 96-8p.  A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p.

The RFC assessment is "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' - - i.e., opinions about what the individual can still do despite . . . her impairment(s)."  SSR 96-8p.  The RFC assessment "must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion

from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p.

While the ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant

evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000), the Eight Circuit has also noted that a

claimant's RFC is "a medical question." Singh v. Apfel, 222 F.3d 448, 451 (2000).

  In the present case, the Court concludes that the ALJ erred by not giving Dr. Anderson's opinion

controlling weight as required by 20 C.F.R. § 404.1527(d)(2). The Commissioner argues that Dr.

Anderson's opinion was inconsistent with the medical record as a whole, and that substantial evidence

exists to support the ALJ's rejection of Dr. Anderson's opinion. The Commissioner argues that the

assessments by the State Agency medical consultants, Dr. Friedland and Dr. Chisholm, conflicted with the

opinions of Dr. Anderson. In addition, the Commissioner argues that, in 2002, Dr. Anderson noted that,

with medications, Plaintiff's pain levels were much lower and her quality of life was higher, and that "notes

such as this further support the ALJ's decision." (Def..'s Mem. at 8.) Finally, the Commissioner argues

that the ALJ pointed to Plaintiff's "wide range" of daily activities in support of his decision to disregard Dr.

Anderson's opinion regarding Plaintiff's physical limitations. (Def.'s Mem. at 8.)

  In the present case, the ALJ gave "great weight to Dr. Anderson's opinion that claimant is able to

lift 10 pounds and that she should not be exposed to unprotected heights and moving machinery" and

therefore the ALJ incorporated these limitations into his final determination of Plaintiff's RFC. (Tr. at 30.)

However, the ALJ gave "no weight to the limit of three hours of work per day set by Dr. Anderson"

because, according to the ALJ, that opinion is "not well-supported by medically acceptable clinical and

laboratory diagnostic techniques and it is inconsistent with his own medical records that reflect that her pain

levels have decreased and her functional abilities have increased with ongoing treatment." (Tr. at 30.) In

addition, the ALJ did not address Dr. Anderson's opinion that Plaintiff needed to alternate positions; that is, Dr. Anderson's opinion that Plaintiff was only capable of sitting, walking and standing for a total of fifteen to thirty minutes at a time, could only sit and stand for one hour in an eight hour day, and could only walk two hours in an eight hour day.  (Tr. at 30-31; 254; 405; 427; 459; 493-94.)

> **1.    The ALJ did not give a good reason for disregarding Dr. Anderson's opinion that Plaintiff was required to alternate positions frequently.**

A review of the record demonstrates that Dr. Anderson consistently and continuously opined that Plaintiff needed to alternate positions frequently.  In November 2001, Dr. Anderson completed a physical capabilities evaluation in which he concluded that Plaintiff could sit, stand and walk for a total of fifteen minutes at a time, and a total of one hour during an eight-hour work day.  (Tr. at 254.)  At that time Dr. Anderson also stated Plaintiff was totally restricted from activities involving sustained positions.  (Tr. at 254.)  In March 2003 Dr. Anderson opined that Plaintiff was restricted to sitting, standing, and walking for a half an hour at a time.  (Tr. at 405.)  In April Dr. Anderson noted that these physical restrictions were the same and in September Dr. Anderson noted that Plaintiff was only capable of sitting, standing and walking for only ten to fifteen minutes at a time.  (Tr. at 427; 459.)  On December 22, 2003, Dr. Anderson reiterated this assessment, and further noted that Plaintiff moved around frequently during her visit with him. (Tr. at 493-94.)  The ALJ failed to even address Dr. Anderson's opinion that Plaintiff needed to alternate positions frequently when the ALJ determined Plaintiff's RFC.

The Commissioner argues that Plaintiff cites no authority in support of the proposition that the ALJ should have explicitly rejected Dr. Anderson's opinion that Plainitff needed to alternate positions.  (Def.'s Mem. at 10.)  The Commissioner notes that "an ALJ is not required to discuss all the evidence submitted,

and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (Def.'s Mem. at 10) (quoting <u>Craig v. Apfel</u>, 212 F.3d 433, 436 (8th Cir.2000)).  However, as stated above, no matter what weight the ALJ determines should be afforded the treating physician's opinion, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." <u>Reed v. Barnhart</u>, 399 F.3d 917, 921 (8th Cir.2005) (quoting 20 C.F.R. § 404.1527(d)(2)). In the present case, the ALJ failed to give any reasons for his failure to give any weight to Dr. Anderson's opinion that Plaintiff must alternate positions frequently.  Therefore, the Court recommends that the decision of the ALJ be reversed and that the ALJ afford Dr. Anderson's opinion controlling weight in accordance with 20 C.F.R. § 404.1527(d)(2).

> **2.  The ALJ did not give a good reason for disregarding Dr. Anderson's opinion that Plaintiff was only capable of working three to four hours per day.**

The ALJ reviewed the medical record and concluded that the "objective medical evidence and treatment record regarding [Plaintiff's] back conditions is inconsistent with disabling limitations." (Tr. at 29.)  The ALJ first noted that, in 1999, six weeks after surgery, Plaintiff had "no significant complaints and . . . reported that she has not felt this well in years." (Tr. at 29.)  The ALJ further noted that Plaintiff "denied any pain in her neck or upper extremities [and that] Dr. Garvey gave her a return to work slip." (Tr. at 29.)  The ALJ's review of the medical record notes that, in January 2003, Dr. Anderson stated that Plaintiff was taking her medications as prescribed, was not reporting any side-effects, was reporting that her pain was reduced, was reporting that her daily functioning had improved, and was participating in a daily exercise program to improve her flexibility and conditioning.  (Tr. at 29.)

Then, in March 2003, the ALJ noted that Dr. Anderson examined Plaintiff and reported that

"although [Plaintiff] had pain and tenderness in her neck and cervical spine, she had normal neurological function and normal sensory, strength, coordination and reflex examinations." (Tr. at 29.)  The ALJ concluded that, since Dr. Anderson stated that Plaintiff's "current medical regimen should continue" that this note "suggests that [Plaintiff's] medical condition was stable." (Tr. at 29.)  The ALJ further notes that, in May 2003, Dr. Anderson saw Plaintiff for a "flare-up of neck and back pain" and that Dr. Anderson noted that Plaintiff's "pain is now episodic and the current flare-up had lasted about one week." (Tr. at 29.)  The ALJ again noted that Dr. Anderson continued Plaintiff's medications at that time because "they have afforded her significant relief with no untoward side effects." (Tr. at 29.)  The ALJ further notes that, in September and December 2003, "Dr. Anderson continued her medical regimen as it was successful in reducing her symptoms and improving her overall functioning." (Tr. at 29.)  The ALJ concluded, from this review, that "Dr. Anderson's medical records suggest that [Plaintiff's] symptoms were reduced with conservative treatments on a long term basis and do not support further reduction in the [RFC]." (Tr. at 29.)

The ALJ also points to two statements from the October 9, 2002, visit to support the ALJ's conclusion that Dr. Anderson's opinion is not entitled to any weight.  On October 9, 2002, Dr. Anderson noted that Plaintiff's combination of medications allowed her to "be far more functional than what she can be without them" and he also noted that "her pain levels [we]re much lower, and her quality of life [wa]s higher." (Tr. at 420.)  The ALJ points to these statements as proof that Dr. Anderson's opinion that Plaintiff can only work three hours a day is inconsistent with his own opinions and the medical evidence as a whole. (Tr. at 420.)  However, a review of the medical records submitted from Dr. Anderson contradict the ALJ's assertion that Dr. Anderson's own medical records are inconsistent with his opinion that Plaintiff

38

cannot work more than three hours per day.  The ALJ overlooked the fact that Dr. Anderson consistently and continuously opined that Plaintiff was limited to no more than three to four hours of work per day.  In November 2001, Dr. Anderson noted that Plaintiff had been attempting to work two to three hours per day four or five days per week but that "[e]ven at this limited level she frequently has a sharp rise in pain at work." (Tr. at 252.)  In response to Plaintiff's increase in pain, Dr. Anderson increased Plaintiff's prescription for MS Contin and prescribed a tilt table. (Tr. at 252-53.)  Also in November 2001, Dr. Anderson completed a physical capabilities evaluation in which he concluded that Plaintiff could sit, stand and walk for a total of fifteen minutes at a time, and a total of one hour during an eight-hour work day. (Tr. at 254.)

In March 2002 Dr. Anderson noted that Plaintiff was able to walk short distances for exercise, that it was "quite difficult" for her to lift anything more than five to ten pounds, and that "three hours per day, four days per week of very light activity is many times more than what she is able to tolerate." (Tr. at 332.)  In June 2002 Dr. Anderson noted that Plaintiff "feels exhausted and miserable with pain" and that Plaintiff reported that "if she sits in one position for long protracted periods of time, or has to do any repetitive movement involving the upper extremities or neck, the pain becomes more significant." (Tr. at 421.)  In March 2003 Dr. Anderson opined that Plaintiff was restricted to sitting, standing, and walking for a half an hour at a time, and that she could only sit and stand one hour in an eight hour day, and could walk two hours in an eight hour day. (Tr. at 405.)  In April, Dr. Anderson noted that Plaintiff's physical restrictions were the same. (Tr. at 427.)  In September Dr. Anderson noted that Plaintiff was only capable of sitting, standing and walking for only ten to fifteen minutes at a time. (Tr. at 459.)  On December 22, 2003, Dr. Anderson reiterated this assessment, and further noted that Plaintiff moved around frequently during her

visit with him.  (Tr. at 493-94.)  A review of this evidence shows that Dr. Anderson's opinion that Plaintiff could only work three to four hours per day is not inconsistent with his own medical records, as his medical records do not "reflect that her pain levels have decreased and her functional abilities have increased with ongoing treatment," as the ALJ claims they do.  (Tr. at 30.)

In addition to arguing that Dr. Anderson's opinion was inconsistent with his own medical records, the ALJ argued that Dr. Anderson's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  (Tr. at 30.)  In support of this finding, the ALJ pointed to the independent medical examination of Dr. Friedland, which was completed on May 13, 2002.  (Tr. at 441-48.)  The ALJ noted that he gave "weight to the opinion [of Dr. Friedland] . . . to the extent that the diagnostic tests and clinical examination results demonstrated that [Plaintiff's] condition was stable and allowed for a return to gainful work and she should not lift above the shoulder level."  (Tr. at 30.)  In addition, the ALJ pointed to the conclusions of the State Agency Medical Consultants in support of his conclusion that Dr. Anderson's three hour work limit was not well-supported by clinical and laboratory diagnostic techniques.  The ALJ gave "great weight" to the opinion of the State Agency Medical Consultant, which limited Plaintiff to "the sedentary exertion level with no repetitive overhead activities and avoiding concentrated exposure to hazardous machinery and heights" because the opinion was "consistent with the objective findings in the record and it was based on a review of diagnostic tests and the results of clinical examinations."  (Tr. at 31.)  However, the ALJ never pointed to any "medically acceptable clinical and laboratory diagnostic techniques" that discredited Dr. Anderson's opinion that Plaintiff be limited to three to four hours of work per day.

The ALJ also noted that Plaintiff's daily activities were inconsistent with greater RFC reductions;

40

however, this claim is not supported by the record or the case law. As noted above, the RFC is an assessment of the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p. A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. It is well-settled law that a plaintiff "need not prove she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir.1989). Therefore, the fact that Plaintiff can perform some activities of daily living is not inconsistent with her alleged disability. The Eighth Circuit has noted that courts "must guard against giving undue evidentiary weight to a claimant's ability to carry out the activities incident to day-to-day living when evaluating the claimant's ability to perform full-time work." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir.2005).

The fact that Plaintiff may be able to exercise at home twice a week for a limited period of time does not mean that a greater RFC reduction is not warranted. (Tr. at 176.) Similarly, although the ALJ noted that Plaintiff took her dog for "brisk walks" the record shows that Plaintiff stated on her daily activities questionnaire that she does this, at most, for thirty minutes per day, which is entirely consistent with Dr. Anderson's opinion. (Tr. at 179.) In addition, this questionnaire was completed on January 13, 2002, and medical records from Dr. Anderson show that Plaintiff experienced a decrease in her functional abilities since that time. The ALJ further noted that Plaintiff reported she was able to "go shopping, run errands, prepare meals . . . and clean her house." (Tr. at 33.) However, a closer inspection of Plaintiff's daily living questionnaire reveals that Plaintiff reported that she used to enjoy cooking prior to her injury, but that her boyfriend now had to do all of the cooking, and that he also completed all the grocery shopping and had to assist her when they completed household chores. (Tr. at 174.) This report is entirely consistent

41

with a reduced RFC and with Dr. Anderson's opinion.  In fact, Plaintiff reported that she could only

complete chores for thirty minutes at a time, or less, depending on the chore.  (Tr. at 174.)  The ALJ noted

that Plaintiff reported that she enjoyed going out to eat and to movies, playing cards and games, and

reading.  (Tr. at 33.)  However, Plaintiff's daily activities questionnaire states that Plaintiff enjoyed reading

but that it was hard for her to read for long because it was hard to hold the book for long periods, and she

was forced to switch positions frequently, and hence could only read for fifteen to twenty minutes at a time.

(Tr. at 174.)  Plaintiff stated she played cards or games monthly, but only occasionally because it hurt her

back to sit for long.  (Tr. at 176.)

       As stated above, no matter what weight the ALJ determines should be afforded the treating

physician's opinion, "[t]he regulations require that the ALJ 'always give good reasons' for the weight

afforded to a treating physician's evaluation."  <u>Reed v. Barnhart</u>, 399 F.3d 917, 921 (8th Cir.2005)

(quoting 20 C.F.R. § 404.1527(d)(2)).  In the present case, the ALJ has not given good reasons for

disregarding Dr. Anderson's opinion that Plaintiff cannot work for more than three to four hours per day.

As noted above, Dr. Anderson's opinion that Plaintiff cannot work more then three to four hours are

internally consistent throughout the medical record, and the ALJ has not given good reasons for failing to

afford that opinion any weight.  In addition,  the Court concludes that the ALJ has not given good reasons

for refusing to discuss Dr. Anderson's opinion that Plaintiff must alternate positions frequently due to her

back condition.  Specifically, the ALJ has not given good reasons for disregarding the opinion of Dr.

Anderson, Plaintiff's treating physician, that Plaintiff cannot sit, stand or walk for more than fifteen minutes

to thirty minutes at a time.  (Tr. at 427-29; 459.)  Therefore, the Court recommends that the ALJ's decision

be reversed, with the direction that the ALJ afford Dr. Anderson's opinion controlling weight as required

by 20 C.F.R. § 404.1527(d)(2).  As the Court recommends that this case be reversed, the Court will not

address Plaintiff's remaining argument.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED**

that:

    1.      Plaintiff's Motion for Summary Judgment [# 17] be **GRANTED**; and

    2.      Defendant's Motion for Summary Judgment [# 31] be **DENIED**.


DATED: July 6, 2006           *s/ Franklin L. Noel*
                           FRANKLIN L. NOEL
                           United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 25, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.